## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal Case No. 20-10241-GAO** |
| | ) | |
| RALPH CARUSO, | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Ralph Caruso stands convicted of 7 counts of tax fraud and 5 counts of workers' compensation fraud.  For at least 8 years, he operated a scheme that defrauded the Internal Revenue Service (IRS) of at least $ 546,320 in federal taxes,[1] and defrauded workers compensation insurance carriers of at least an additional $ 93,430 in premiums for insurance to cover workers in event of work-related injuries.  Caruso intentionally failed to report more than $ 2.2 million in wages paid under-the-table to employees, intentionally failed to withhold employee taxes from those wages, intentionally failed to pay the employer 7.6% share of FICA to the IRS on those wages, and intentionally concealed the under-table wages during audits by workers' compensation insurance carriers.  The employees who received the under-table wages also did not report or pay taxes on those under-table wages.

After thorough consideration of the offenses and the Section 3553 factors, including the defendant's medical conditions and letters of support, the Government recommends a sentence of 1 year and 1 day imprisonment, to be followed by 3 years of supervised release, an Order of restitution in the amount of $ 93,430 to insurance carriers with credit for the full amount paid to date, an Order

---

[1]  By the same scheme, Caruso necessarily defrauded the Commonwealth of Massachusetts of $ 112,812 in uncharged state taxes, calculated as 5.1% of $ 2,212,000 in unreported wages.

of restitution to the IRS as a condition of supervised release in the amount of $ 546,320.94 with credit for the full amount paid to date, an Order of forfeiture in the amount of $ 51,504 as charged in the Information *increased to* $ 93,490 per paragraph 6 of the Plea Agreement, and special assessments of $ 1,200.

In the PreSentence Report (PSR), the Probation Officer has calculated the total offense level as 16 and the resultant guideline imprisonment range as 21 to 27 months.  As set forth below, the Government submits that the correct total offense level is 20 with a resultant guidelines sentencing range of 33 to 41 months.  The Government recognizes that its sentencing recommendation is in either case below the sentencing guidelines range, but any sentencing must first involve the Court determining the correct guidelines calculations.  Accordingly, the Government requests this Court to apply the USSG enhancements as set forth below before determining the appropriate sentence to impose.

## I.      The Applicable Sentencing Enhancements

The Plea Agreement in this case contemplated two potential USSG enhancements:  a 2-level increase for Caruso's role as the organizer or leader of the tax fraud schemes and a 2-level increase for Caruso's use of sophisticated means in carrying out each scheme.  *See* Plea Agreement at ¶ 3. The defendant reserved the right to argue that the enhancements do not apply.  *Id*.  The PSR did not incorporate or exclude these two enhancements, rather "[t]he Probation Office defers to the government to defend its positions in the plea agreement."  PSR at p. 24.

The following presents the USSG numerical positions of the Government and the defense:

| The Tax Offenses | Per Government: 18 | Per Defense: 18 |
|---|---|---|
| Organizer/Leader | +2 | +0 |
| Sophisticated Means | +2 | +0 |
| | **22** | **18** |

| The Mail Frauds | Per Government: | 7 | Per Defense: | 7 |
|---|---|---|---|---|
| Loss Amount | | +6 | | +6 |
| Sophisticated Means | | +2 | | +0 |
| | | **15** | | **13** |

| Disparity | Per Government 7 levels | | Per Defense 5 levels | |
|---|---|---|---|---|
| Grouping Impact | Per Government | +1 | Per Defense | +1 |
| Combined Level | Per Government (22+1) | **23** | Per Defense | **19** (18 + 1) |
| Plea/Acceptance -3 | Per Government | **20** | Per Defense | **16** |
| USSG Range | Per Government 33 – 41 months | | Per Defense 21 – 27 months | |

### A.   Enhancement for Organizer or Leader

Defendant Caruso argues that the 2-level increase under USSG § 3B1.1(c) for his role as the organizer and leader of the tax fraud offenses is inapplicable because, he asserts, he acted entirely alone with no other culpable participants in the tax scheme.[2]   *See*, PSR defense objections at P. 24, reiterated in Dkt. 22 at 18-19.   His argument asserting no culpable participants is entirely undone by the facts.[3]

First, the defendant's own sentencing memorandum states that "the majority of the unreported wages were paid to individuals who plow snow for the Caruso Companies and requested they be paid in cash." Dkt. 22 at 11.  This statement alone clearly contradicts the defendant's claim that there were no other culpable participants.[4]   Second, the PSR at ¶ 12 noted that "[t]he general manager had been a recipient of significant under-the-table wages. . . ."  In fact, the IRS investigation

---

[2]   The defendant's statement resolves one component of USSG 3B1.1, *viz.*, that he organized, led, managed and supervised the tax fraud scheme.  *See*, USSG 3B1.1(a),(b)(c). See also, USSG 3B1.1, App. N. 2 and N. 4.

[3]   This Court need not make an alternative finding that Caruso's scheme enduring for 8+ years, involving more than 50 employees and regarding more than $ 2,200,00 in wages is also "otherwise extensive."  USSG 3B1.1(a)(b).

[4]   This statement is also inaccurate because the under-the-table payments occurred in all four quarters over the multi-year scheme, not merely in connection with snow plowing.

established that the general manager received, in addition to his on-the-books W-2 wages, $ 276,714 in under-the-table, unreported income.[5]  This individual also had Caruso make some of the under-the-table checks made payable in nominee names, including family members who Caruso and the general manager both knew did not work for Caruso. It is beyond cavil that the general manager was a "culpable participant" in the tax fraud scheme.   For application of the organizer/leader enhancement, there need be only one culpable individual in addition to the defendant.   USSG 3B1.1(a) App. N. 2; *United States v. Arbour*, 559 F.3d 50, 56 (1ˢᵗ Cir. 2009).   Third, there were in fact additional culpable participants because the IRS review of the evidence established that other employees received under-the-table checks in large amounts, for example, $ 168,275 under-table to DK, $ 61,487 to WL, $ 55,251 to EL and $ 38,604 to JA, with other employees receiving lesser amounts.[6]  Again, the defendant cannot be heard to argue that these individuals were not cognizant and culpable participants  when they received paychecks drawn on the payroll account as reflected on W-2's, then accepted such excessive additional and unreported wages drawn on non-payroll accounts not reflected on W-2 forms, and for which they paid no taxes.  They clearly were culpable participants and, at a minimum, the 2-level enhancement under USSG 3B1.1(c) applies.

**B. Enhancement for Use of Sophisticated Means**

Defendant Caruso argues that the 2-level increase under USSG § 2T1.4(b)(2) for his use of sophisticated means is inapplicable because, he asserts, he "did not employ sophisticated means to

---

[5]  To the extent Caruso deflects responsibility by suggesting employees requested to be paid in cash, the unreported amount does not include any cash payments to the general manager. The unreported amount was paid to the general manager from **checks** drawn on the accounts used to pay under-table wages to employees.  In addition, the general manager received an undeterminable amount of cash wages under-the-table.

[6]  Same. The listed amounts represent checks and do not include cash wages.

execute or conceal the offense conduct." *See*, PSR defense objections at P. 23, reiterated in Dkt. 22 at 18.  The facts suggest otherwise.

"Sophisticated means," as used in § 2T1.4(b) (2), includes conduct that is especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  USSG 2T1.4, App. Note 6.  Defendant Caruso employed several such means as to both execution and concealment of the fraudulent schemes.  Moreover, a "scheme may be sophisticated even if the individual elements taken alone are not." *United States v. Foley*, 783 F.3d 7, 25 (1st Cir. 2015) (quoting *United States v. Evano*, 553 F.3d 109, 113 (1st Cir. 2009)).

First, Caruso did not merely pay employees their wages through extant company bank accounts at Eastern Bank and Santander Bank then fail to report a portion of the wages to the IRS. Rather, he established, maintained and used totally different bank accounts at Metro Credit Union for the purpose of paying under-the-table additional wages to employees.[7]  PSR at ¶ 10.  The use of these accounts rather than the payroll accounts made it impossible for the workers' compensation auditor and/or the IRS to determine the actual wages Caruso was paying those employees.   Second, Caruso personally maintained the Metro Credit Union records separate and apart from records that could be found in the company office by secreting them under his sole control outside the office building in a trailer at the back of the property.  This fact made it more difficult for employees, much less the IRS or workers' compensation auditor, to know which individuals received under-table wages and the amount of those wages.  Third, Caruso induced more than 50 employees to participate in his scheme over an 8+ year period and managed to keep every one of those employees from ever reporting any of the under-table wages.  This fact evinces

---

[7] This and the following facts were established from interviews of office employees and/or admissions of Defendant Caruso in an interview by the IRS.

an extensive and structured system operated by the defendant, otherwise there would have been at least an occasional inadvertent reporting of those wages.  Fourth, Caruso used payments from customers to his companies to fund the Metro Credit Union accounts.  He structured those company income payments in such a way that they were not reported on the company books and so were not reported as income to the IRS by the CPA/tax preparer for The Caruso Companies. Thus, Caruso's scheme involved obtaining professionally prepared tax returns to create a convincing façade of a legitimate tax-paying business. Fifth, Caruso employed a system for paying a significant portions of the under-the-table wages in cash.  In addition to using Metro Credit Union checks to pay under-the-table wages, Caruso frequently gave large checks to certain employees in the business office, directed them to go to their banks to cash the checks and bring the cash back to him for paying some under-table wages in cash.  This method of paying some wages in cash added yet another layer to the means of executing his tax fraud and workers' compensation fraud schemes and concealing who and how much among the employees were paid under-the-table.

Caruso's operation of his schemes went beyond the mere under-the-table payment of wages and failure to report those wages on tax records filed with the IRS and produced during workers compensation audits.  While no particular "means" to carry out the offenses may be particularly sophisticated, the moving parts in this case combined to form a sophisticated scheme that compels a two-level enhancement under USSG 2T1.1(b)(2).

## II.   Operation Of The Caruso Companies While The Defendant Is Incarcerated

The defendant's sentencing memorandum provides much speculation about The Caruso Companies suffering total destruction if he is incarcerated, even for a short period of time.  This claim is typical when owners and operators of companies face sentencing.  This type of claim is

also a matter the Courts recognize as a natural and logical consequence, and a known risk taken by the defendant, when the defendant intentionally engages in criminal conduct.

It must be noted that the same sentencing memorandum relies on the defendant's medical conditions and potential for imminent death to seek a non-incarcerative sentence. It is inconceivable, under his medical conditions known since at least January of this year, that no effort has been made to develop succession for The Caruso Companies in the event of his sudden death.

It is also noted that the sentencing memorandum recites how the defendant cares greatly for others, including the employees of his companies. The personal financial statement submitted to this Court reveals the number of Partnerships, S Corporations, LLCs and Trusts owned 50% or 100% by the defendant. The financial statement includes, among others, the identity and value of some of the companies that operated under the collective name of The Caruso Companies located at 320 Charger Street in Revere. Even in the absence of his medical conditions, the defendant has known for a considerable time that he faces the prospect of incarceration and likewise must have, or at a minimum clearly should have, prepared for management and continued operation of his businesses in his absence.

III.   **The Bureau Of Prisons Can Provide Proper Medical Care For The Defendant**

The Government is keenly aware of, and takes seriously, the very significant medical conditions facing Mr. Caruso. Indeed, the Government is taking his medical matters in consideration as part of its reason for recommending a sentence that is well below the applicable USSG sentencing range.

Medical records submitted by the defendant were forwarded to the Bureau of Prisons (BOP) for its medical professionals to review. Attachment One is a letter from Dr. Ellen Mace-Leibson,

Acting Regional Medical Director for the Bureau of Prisons, Northeast Region.[8]  The letter sets out the BOP review of the defendant's medical records and explains that the BOP maintains four progressive CARE levels to provide medical care for the full range of medical conditions among inmates.  Of particular significance, the BOP noted that Caruso is, or is supposed to be, scheduled for multi-valve bypass heart surgery.  Dr. Mace-Leibson recommends that incarceration be delayed until after that surgery and recovery, at which point the BOP is fully prepared to provide appropriate medical care for the defendant.

The Government has considered the facts and circumstances of defendant Caruso's criminal conduct, together with the Section 3553 factors including particularly his medical conditions and community support.  The Government therefore recommends a below-guidelines sentence of 1 year and 1 day of incarceration, 3 years of supervised release, restitution in the amount of $ 93,430 to insurance carriers (with credit for the full amount paid to date), an Order of restitution to the IRS as a condition of supervised release in the amount of $ 546,320.94 (with credit for the full amount paid to date), an Order of forfeiture in the amount of $ 93,490 and special assessments in the amount of $ 1,200.

Respectfully submitted this 8th day of June, 2021.

NATHANIEL R. MENDELL
Acting United States Attorney

By:  /s/ *Victor A. Wild*
VICTOR A. WILD
Assistant U.S. Attorney
1 Courthouse Way
Boston, MA 02210
victor.wild@usdoj.gov
617-748-3100

---

[8]  The Government has sought leave of this Court to file the Bureau of Prisons letter under seal.

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>  /s/ *Victor A. Wild*</u>
VICTOR A. WILD
Assistant U.S. Attorney